IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**AVERY A. TRAINOR**,

Plaintiff,

v.

**UNITED STATES OF AMERICA**,
via Department of Justice
950 Pennsylvania, Ave., N.W.
Washington, D.C. 20530,

**PETER B. HEGSETH**, in his official capacity
as Secretary of War
1000 Defense Pentagon, Room 3E880
Washington, D.C. 20301,

**UNITED STATES DEPARTMENT OF THE NAVY**
1000 Navy Pentagon
Washington, D.C. 20350,

**HUNG CAO**, in his official capacity as
Acting Secretary of the Navy
United States Department of the Navy
1000 Navy Pentagon
Washington, D.C. 20350,

Defendants.

Civil Action No.

## ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiff Avery A. Trainor is a 48-year old, active duty officer in the United States Marine Corps, serving currently in the rank of Lieutenant Colonel. ("Plaintiff" or "LtCol Trainor"). In active and reserve Marine Corps duty, LtCol Trainor has served the United States for more than 27 years. LtCol Trainor has received numerous medals, awards, commendations and two masters

degrees while in service. LtCol Trainor has held multiple diverse duty assignments of significant responsibility requiring skill, judgment and the observance of high standards of military readiness, discipline, honesty and integrity. LtCol Trainor' career as a Marine is exemplary.

2. LtCol Trainor also is a transgender woman. LtCol Trainor served as a male-presenting Marine for nearly 18 years. In 2022, LtCol Trainor received a diagnosis of gender dysphoria. Thereafter, she applied for, and in 2023 completed, a Gender Transition Plan which was approved by her commanding officer pursuant to the policy promulgated by then-Secretary of Defense Lloyd Austin. Upon completion of the Plan, her gender marker was changed from male to female. Both before and after the transition, LtCol Trainor was deployable and complied with all applicable Marine Corps standards. Both before and after the transition, LtCol Trainor's performance evaluations were exemplary. Both before and after the transition, neither gender dysphoria nor being transgender impaired LtCol Trainor's ability to perform her duties. In fact, after the gender-conforming transition, LtCol Trainor's duty performance was even better. A Marine Corps board chose her to attend the prestigious and highly selective Command and Staff College as a resident student, and she was promoted to Lieutenant Colonel.

3. However, because LtCol Trainor is a transgender woman, her Marine Corps career now faces an abrupt end due to the federal government's current policy of purging the United States military of transgender people. That policy, stemming from two Presidential Executive Orders and implemented throughout the military by the Secretary of War (f/k/a Defense), Defendant Pete Hegseth, is referred to herein as the "Hegseth Policy." The Hegseth Policy purports to be an eligibility standard for military service that is based on the diagnosis of a mental health condition – gender dysphoria. In reality, the Hegseth Policy is a categorical ban on transgender people serving in the military regardless of a transgender person's abilities and

regardless of whether gender dysphoria interferes with a transgender person's ability to comply with military standards. Federal courts have ruled that the Hegseth Policy is likely unconstitutional. *Talbott v. United States*, 775 F. Supp. 3d 283 (D.D.C. 2025), *aff'd in part, vacated in part*, 176 F.4th 720 (D.C. Cir. 2026); *Shilling v. United States*, 773 F. Supp. 3d 1069 (W.D. Wash. 2025) *appeal filed*, No. 25-2039 (9th Cir. Mar. 3, 2025).

4. LtCol Trainor is the highest-ranking Marine Corps officer subject to this purge.

5. Having transitioned, LtCol Trainor is not allowed by the Hegseth Policy to remain in the Marine Corps. It is impossible for a transitioned transgender Marine to meet any exception to the Hegseth Policy. She can either "choose" to leave voluntarily or "choose" to be thrown out. Either way, she'll be out. Unlike more junior transgender Marines, LtCol Trainor has the option of any Marine with at least 20 years creditable service, transgender or not, to put in for regular retirement. So, although she strongly preferred to stay in the Marine Corps, LtCol Trainor sought regular retirement as the least damaging path forward. Her application was approved with an effective retirement date of June 1, 2027 at which point she would retire at the rank and retirement pay of a Lieutenant Colonel.

6. However, on May 29, 2026, seven months after the retirement approval, and without any explanation or valid supporting authority, the Deputy Commandant for Manpower and Reserve Affairs (hereinafter the "M&RA Action") precipitously advanced LtCol Trainor's retirement date to November 1, 2026. Five days later, she was relieved of her duties and placed on administrative absence. The M&RA Action reduced LtCol Trainor's retirement pay – for the rest of her life – to that of a Major. The M&RA's Action also portended that, because she is transgender, LtCol Trainor could be labeled as a risk to national security in her DD-214 – a document that a separated or retired Veteran carries around the rest of their life. Such a stigma is

devastating for anyone seeking employment in law enforcement, government contracting or any other job that implicates trust or security. So, although LtCol Trainor tried to retire with dignity and respect, the opposite occurred. She was effectively busted down in rank and slated for an exit from the Marine Corps that is normally seen only in misconduct cases.

7. LtCol Trainor brings this action seeking a declaratory judgment that the Hegseth Policy as applied to Plaintiff is unconstitutional because it violates Plaintiffs' right to Due Process under the Fifth Amendment to the U.S. Constitution, both because it denies Plaintiff the equal protection of the law and because it deprives Plaintiff of her property and liberty without due process of law. Plaintiff seeks preliminary and permanent injunctive relief against Defendants' enforcement of the Hegseth Policy against LtCol Trainor. LtCol Trainor also seeks a declaration that the March 29, 2026 M&RA Action violates the Administrative Procedure Act ("APA"), 5, U.S.C. § 551 et seq., because it is arbitrary and capricious and contrary to law. Plaintiff seeks an order from the Court setting aside the March 29, 2026 M&RA Action and preliminarily enjoining it or staying it pursuant to 5 U.S.C. § 705 during the pendency of this case as well as issuing a permanent injunction that sets aside and enjoins the March 29, 2026 M&RA Action at the conclusion of this case.

**PARTIES**

8. Plaintiff is an active duty Marine Corps officer residing in the Commonwealth of Virginia. Pursuant to LCvR 5.1(c)(1), Plaintiff will file her complete address under seal.

9. Defendant United States of America includes all federal government agencies, departments and individuals responsible for the implementation of the Hegseth Policy.

10. Defendant Pete Hegseth is the United States Secretary of War (f/k/a Secretary of Defense) and is sued in his official capacity.

11. Defendant U.S. Department of the Navy is one of three military departments of the Department of War (f/k/a Defense) and is responsible for the administration and operation of the United States Department of the Navy and the United States Marine Corps.

12. Defendant Hung Cao is the Acting Secretary of the Navy and is sued in his official capacity.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this matter arises under the United States Constitution, the APA, 5 U.S.C. 706, the Declaratory Judgment Act, 28 U.S.C. § 2201, federal statutory law, 10 U.S.C. § 1370, and directives of the Departments of Defense (now War) and Navy and the Marine Corps.

14. Plaintiff has standing to bring this case pursuant to Article III of the Constitution. By terminating her Marine Corps career abruptly and prematurely through a forced retirement on the ground that she had a prior diagnosis of gender dysphoria, without any evidence that such condition impaired LtCol Trainor's ability to perform her duties as a Marine Corps officer, the Hegseth Policy has inflicted a concrete and particularized harm upon Lt.Col Trainor. The M&RA Action likely causes LtCol Trainor concrete and particularized harm because it deprives her of retirement benefits that she otherwise would be entitled to, stigmatizes her with false re-entry and separator codes, marginalizes her by placing in administrative absence thereby depriving LtCol Trainor the ability to serve in her chosen profession. All of these harms are the direct result of the Hegseth Policy and the M&RA Action. The relief that LtCol Trainor seeks – declaring the Hegseth Policy unconstitutional as applied to LtCol Trainor, setting aside the M&RA Action under the APA and enjoining the Hegseth Policy and enjoining or staying the M&RA Action will remedy harms that LtCol Trainor complains of.

15. The M&RA Action is final agency action that is judicially reviewable under the APA. LtCol Trainor has not failed to exhaust any mandatory administrative remedies before seeking review of the M&RA Action. Any such potentially applicable administrative remedies are not mandatory and are not required to be pursued because doing so would inflict irreparable harm on LtCol Trainor and would be futile.

16. Venue is proper in this District because a substantial part of the events at issue occurred here and the Defendants are located here. 28 U.S.C. § 1391(e)(1)(A) & (B).

## STATEMENT OF FACTS

### I. LtCol Trainor's Marine Corps Career

17. LtCol Trainor initially served as an enlisted Marine between 1998 and 2002. Her Military Occupational Specialty (MOS) was 0311 – rifleman. She was a fire team leader and squad leader and attained the rank of Corporal. She was released from active duty in 2002 and served in the Individual Ready Reserve from 2002 to 2006 while completing her undergraduate degree. She was awarded the Good Conduct Medal.

18. After attending college and obtaining a bachelor's degree in English from the College of Charleston, LtCol Trainor rejoined the Marine Corps through Officers Candidate School and was commissioned as a Second Lieutenant in May 2008. Following completion of The Basic School, LtCol Trainor completed military police training and received the MOS 5803 – Military Police Officer -- holding several important assignments in that specialty. She was a platoon commander with Marine Wing Support Squadron 372. She also served as Company Commander for the 1st Law Enforcement Battalion at Camp Pendleton, California, and deployed to Afghanistan in 2012 as the Antiterrorism and Force Protection Officer for a forward-deployed Marine aviation command, in support of the combat operation known as Operation Enduring Freedom 12.1. Thereafter, she served as Operations Officer and then as Staff Secretary to the

Commanding General, Marine Corps Installations Pacific, Marine Corps Base Camp Butler, Okinawa, Japan, where she led 234 Marines and a 238-member Japanese Security Guard force. She later served at Headquarters Marine Corps as Aide de Camp to the Deputy Commandant for Programs and Resources, a lieutenant general. An Aide de Camp assignment generally will go only to an officer who is considered to be a rising star. After Okinawa, LtCol Trainor was selected to attend the Naval Postgraduate School where she earned an MBA in Financial Management that in turn led to a secondary MOS 8844 – Financial Management Specialist.

19. From July 2020 through June 2023, LtCol Trainor served as the Provost Marshal for the Marine Air-Ground Task Force Training Command/Marine Corps Air-Ground Combat Center at Twentynine Palms, California. Twentynine Palms is a 1,102 square mile installation, about the size of Rhode Island, and is the largest Marine Corps base in the world. Located in the high Mojave Desert, it is the primary live-fire training facility in the Marine Corps. LtCol (then Major) Trainor was responsible for security and military law enforcement for the entire installation. She commanded nearly 200 Marine law enforcement and other personnel.

20. It was at Twentynine Palms when LtCol Trainor began and completed the process of transitioning to the gender that she identifies with – female. It was also at Twentynine Palms when LtCol Trainor was chosen to attend the highly selective Marine Corps Command and Staff College (Command & Staff) at Quantico, Virginia, as a resident student. Only about 20% of eligible Majors are chosen to attend the Command & Staff resident course. Selection requires consistent performance in the top-tier of fitness report ratings and demonstrated excellence in high-impact or command leadership billets. LtCol Trainor completed Command & Staff and earned a Master of Military Studies. She was promoted to Lieutenant Colonel and assigned to Marine Corps Headquarters in the Pentagon as Deputy Branch Head, Cost Branch, Program Analysis and

Evaluation Division of Program Resources. She provided financial analysis in support of the Marine Corps budget in this position when the events at issue in this case began.

21. LtCol Trainor's combat training includes qualifying with the rifle and pistol as an Expert, which is the highest rating in the rigorous marksmanship standards of the Marine Corps. She completed the Special Reaction Team course which focused on close quarters combat marksmanship, room clearing and breaching methods. She is trained as an "Antiterrorism Officer Advanced." As an enlisted Marine, LtCol Trainor completed the mountain-warfare-oriented Mountain Leaders Course, was an instructor in Military Operations on Urbanized Terrain, and completed the rugged Jungle Survivor Course.

22. Among other decorations, LtCol Trainor has been awarded the Meritorious Service Medal, the Navy and Marine Corps Commendation Medal (three times), the Navy and Marine Corps Achievement Medal and the Afghanistan Campaign Medal for her 2012 deployment.

## II. <u>LtCol Trainor Transitions to Her Identified Gender</u>

23. A transgender person is an individual who has a sexual identity or gender expression that differs from their assigned sex at birth. *Talbott*, 176 F.4th at 730. Being transgender, by itself, is not a mental health condition. *Id*. at 732. Gender dysphoria is. "A subset of transgender persons often have a condition called gender dysphoria" which is a "'marked incongruence between one's experienced/expressed gender and assigned gender' that 'is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" *Id*. (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), 452–53 (5th ed. 2013)).

24. Prior to 2016, being transgender or having a history of gender dysphoria was disqualifying for military service. *Talbott*, 176 F.4th at 730-31. In the Obama and first Trump

Administrations, policy on whether persons with a history of gender dysphoria should be allowed to serve in the military went back and forth. It was not until the Biden Administration when transgender people were allowed both to serve openly and to transition while in service provided they met otherwise applicable military standards. *Id*. at 731-33. Defense Secretary Lloyd Austin implemented this policy in April 2021 with DoDI 1300.28 (Austin Policy). *Talbott*, 176 F.4th at 733; *Talbott*, 775 F. Supp. 3d at 296.

25. LtCol Trainor's decision to transition to her identified female gender was not an overnight decision; it was the product of a lifelong process of self-examination. For the first 18 years of her service in the Marine Corps, she had presented as a male and complied with all male Marine uniform, grooming, physical fitness and other standards. To the extent that she had struggled with difficulties related to gender dysphoria, she walled them off. None of them interfered with the performance of her duties as a Marine and none of them was ever noted in any of her periodic health assessments. None of them was ever the subject of a Medical Evaluation Board conducted as part of the Disability Evaluation System. Even at the time of the 2022 diagnosis, her condition was stable. She remained deployable, which means mentally and physically fit to execute operational missions worldwide immediately without the need for special medical care that is unavailable in the field. She also held an active security clearance at the level of Top Secret/SCI, meaning she was cleared to handle Top Secret and Sensitive Compartmented Information. Nonetheless, while serving as Provost Marshal at Twentynine Palms, after consultation with health professionals and in light of the 2021 Austin Policy, LtCol Trainor decided to transition.

26. On November 4, 2022, LtCol Trainor received a formal diagnosis of gender dysphoria from a medical provider. Thereafter, she applied for and, on December 28, 2022

obtained her commanding officer's approval, of a Gender Transition Plan. The Gender Transition Plan required that she: (1) establish a medical treatment plan with her military medical provider; (2) live in her preferred gender while off-duty for a minimum of 6 months; (3) coordinate any necessary medical leave to minimize impact to Command readiness; (4) receive a determination from her military medical provider that she is stable in her preferred gender; (5) legally record her gender change with the appropriate state vital records department; and (6) submit her gender marker change to the Defense Enrollment Eligibility Reporting System (DEERS) after Command approval.

27. After living in her identified female gender off duty for 4 months, LtCol Trainor applied for an Exception to Policy (ETP) that, among other things, would permit her to abide by female uniform and grooming standards while on duty. All of her commanders endorsed this request, and Marine Corps Headquarters approved the ETP for uniform and grooming standards on April 24, 2023. The ETP authorized her to comply with female uniform and grooming standards and did not authorize her to comply with the corresponding male standards. Thereafter, LtCol Trainor successfully completed her Gender Transition Plan, and her DEERS marker was changed to "female" in June 2023.

28. The transition had no negative effects on LtCol Trainor's performance of her duties. In fact, now that she could live openly, not only as a female, but as a female Marine, her performance improved. She was chosen as a resident student for the prestigious and selective Command & Staff program which she successfully completed and obtained promotion to Lieutenant Colonel. As before the transition, her reviewers continued to rate her as "one of the few exceptionally qualified Marines." Reviewer commentary spanning the period before and after the transition continued to show the same superlative trend: "promote ahead of peers," "an absolute

must for O5 command" (05/31/21);" a "must select for promotion and battalion command," "unlimited energy and professionalism" (05/31/22); "promote now and select for command," an "engaged leader" (05/31/23); "ready for increased professional responsibilities and well suited for assignment on a higher-level Joint staff" (06/04/24); "an exceptional officer," "I highly recommend LtCol Trainor for promotion and retention" (02/28/25). Her fitness report for the period ending September 29, 2025 stated: "LtCol Trainor has shown that she is able to excel in the most challenging situations and is ready to serve in the Service's most demanding billets. Recommend for selection to command and promotion." On her most recent fitness report, covering the period ending February 28, 2026 and signed March 27, 2026, her reviewing officer again marked her "one of the few exceptionally qualified Marines" and wrote: "Avery is the epitome of a Marine Officer. This is the type of Marine I want leading my son. . . . Promote now and slate for command at first opportunity." Her reporting senior wrote that she "is among the most talented staff officers I've served with in 28 years of active duty and 6 years of civilian service" and "enthusiastically recommend[ed]" her "for promotion and selection for command." That report was signed two months before the M&RA Action.

29. In the three years since the transition (and before the events giving rise to this lawsuit), LtCol Trainor remained fully deployable, was stable in her identified gender and complied with all applicable Marine Corps physical fitness and other standards. She also continued to hold a Top Secret/SCI active security clearance. At the end of 2024, LtCol Trainor's Marine Corps career was on an upward trajectory, potentially towards a command and consideration for promotion to full Colonel (O-6) thereafter.

## III. <u>The Federal Government Decides to Rid the U.S. Military of Transgender People</u>

30. On Inauguration Day, January 20, 2025, President Trump signed an Executive Order stating that the federal government will only recognize two sexes – biological male and biological female. *Talbott*, 176 F.4th at 734. The President "decried 'gender ideology,' which he defined as 'replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa.'" *Id*. (quoting Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)). A week later, the President imposed this concept of "biological truth" on the U.S. military, declaring that the armed forces had become "'afflicted with radical gender ideology'" and that a service member who expresses a "'false gender ideology divergent from an individual's sex cannot satisfy the rigorous standards for military service.'" *Id*. (quoting Executive Order 14183, 90 Fed. Reg. 8575 (Jan. 27, 2025)). As the D.C. Circuit observed, "[i]n sum, the Commander-in-Chief declared transgender people as categorically unfit for military service explicitly because of their gender identity." *Id.*

31. Secretary of Defense (now War) Hegseth carried out these Presidential directives in the February 2025 Hegseth Policy. See *Talbott*, 176 F.4th at 734-36. The Hegseth Policy declared that anyone with a current or prior diagnosis of, or symptoms consistent with, gender dysphoria was no longer eligible to serve in the U.S. military. This was because such individuals supposedly "do not meet the 'high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.'" *Talbott*, 176 F.4th at 735 (quoting Hegseth Policy). The Hegseth Policy declared that, henceforth, uniform and grooming standards, access to restroom and showering facilities and use of pronouns were all to be based on a person's biological sex. Transgender service members whom the Hegseth Policy decreed were no longer eligible to serve

– namely all transgender service members – would be separated from service administratively, which is typically reserved for misconduct cases. *Talbott*, 176 F.4th at 735.

32. The Hegseth Policy prompted immediate litigation. In the U.S. District Court for the District of Columbia, a group of active duty and prospective transgender service members sought a preliminary injunction against the Hegseth Policy. On March 18, 2025, the District Court granted a preliminary injunction on the ground that the Hegseth Policy was likely unconstitutional because it violated the equal protection component of the Fifth Amendment to the U.S. Constitution. The Court ruled that whether the Hegseth Policy constituted (1) discrimination on the basis of sex or (2) discrimination against a suspect class (transgender people), it failed intermediate scrutiny. This was because, even with great deference to military judgment, the discriminatory means chosen (banning transgender people from the military) were not substantially related to the professed governmental objectives (military readiness, order, discipline and cost). *Talbott*, 775 F. Supp. 3d at 315-326. In fact, there was no evidence that transgender people or people with a history of gender dysphoria serving in the military undermined readiness, order or discipline or that their medical care cost too much. *Id.*

33. The District Court also ruled that the Hegseth Policy failed to pass muster even under the rational basis standard because the only apparent justification for the transgender ban was animus against transgender people, and animus against a marginalized minority group is not a rational basis for differential treatment. *Talbott*, 775 F. Supp. 3d at 325-33. As the District Court observed: "The Military Ban is soaked in animus and dripping with pretext. Its language is unabashedly demeaning, its policy stigmatizes transgender persons as inherently unfit, and its conclusions bear no relation to fact. Thus, even if the Court analyzed the Military Ban under rational basis review, it would fail." *Id.* at 326.

34. The District Court entered a nationwide preliminary injunction enjoining application of the Hegseth Policy to active duty and prospective service members. *Talbott*, No. 25-cv-00240-ACR, Order (D.D.C. Mar. 18, 2025) (Dkt. 88). However, the preliminary injunction was stayed, first by District Court temporarily, and ultimately by the D.C. Circuit for the duration of the government's appeal. *Talbott*, 176 F.4th at 729.

35. On June 1, 2026, the D.C. Circuit issued a divided opinion that affirmed in part and vacated in part the District Court's injunction. *Talbott*, 176 F.4th at 750. The two Circuit Judges in the majority agreed with the District Court that the Hegseth Policy was likely unconstitutional, even under rational basis review. *Id.* at 737-47, 750-54. However, they differed on the scope of the injunction. Judge Wilkins believed the preliminary injunction should only apply to active duty service members while Judge Rogers believed it should cover both active duty and prospective service members. *Id.* at 748-50, 754-56. Nonetheless, they both agreed that the preliminary injunction should not be nationwide, so it was limited to the active duty service members who are plaintiffs in the *Talbott* case. *Id.* at 750. On the same day, the D.C. Circuit, on its own motion, withheld mandate until the disposition of a timely motion under Fed. R. App. P. 41(b)(1). *Talbott*, No. 25-5087, Order (D.C. Cir. June 1, 2026). The government filed a timely motion for stay of mandate in order to seek Supreme Court review. As a result, the appellate mandate has yet to issue and the *Talbott* injunction, as modified by the D.C. Circuit, has yet to go into effect.

## IV. <u>The Hegseth Policy's Impact on LtCol Trainor and Her Coerced Decision to Retire</u>

### A. <u>The Upheaval Caused by The Transgender Ban</u>

36. The Hegseth Policy reverberated throughout the Marine Corps in a series of ALNAV's (all Navy messages) and MARADMIN's (Marine Corps administrative messages) –

directives that have binding effect within the Navy and the Marine Corps, respectively. ALNAV 023/25 (Mar. 13, 2025) decreed that there are only two sexes in the Navy (biological male and female); revoked all prior exceptions that allowed conformance to standards different from a service member's DEERS gender marker; and declared that all persons with a diagnosis or history of, or symptoms consistent with, gender dysphoria "are no longer eligible for military service." Such ineligible personnel were to be separated administratively either voluntarily (with a payment of twice involuntary separation pay) or involuntarily (with normal separation pay). Ineligible personnel had 15 days – until March 28, 2025 – to choose the exit lane. What the transgender person who declined the voluntary exit lane could expect in terms of how they would be discovered and the process that would be used to get rid of them remained undisclosed. Regardless of lane "choice," however, all such ineligible personnel were to be placed on administrative absence (at full pay) and designated non-deployable until separated. MARADMIN 128/25 (Mar. 14, 2025), implemented these same orders for the Marine Corps. Neither directive said anything about whether a transgender Marine affected by these policies could, if otherwise eligible for it, simply retire in the normal course. Regular retirement generates a lifetime monthly payment and other benefits; voluntary separation would have generated a single lump sum but no retirement benefits.

37. The transgender personnel purge was paused temporarily with ALNAV 25/25 (Mar. 29, 2025) due to the ongoing litigation, but resumed in May with ALNAV 038/25 (May 12, 2025) and MARADMIN 239/25 (May 22, 2025). In revoking prior exceptions to policy, ALNAV 038/25 went further and declared that "military personnel must adhere to standards in accordance with their biological sex." This indicated, for example, that even a transgender female Marine who had transitioned and had a DEERS marker of female would have to comply with male uniform, grooming and other standards. As before, personnel with a diagnosis or history of, or symptoms

consistent with, gender dysphoria "are no longer eligible for military service." The same voluntary/involuntary "choices" of separation were offered with a deadline of June 6, 2025. Those slated for separation would be placed on administrative absence and designated non-deployable. In terms of what a Marine who declined to go voluntarily could expect in terms of process, "[f]urther guidance will be provided."

38. These directives had a seriously negative impact on LtCol Trainor. Having presented in her identified gender as a female Marine for nearly two years without incident, she now faced having to wear the male uniform. Her previously granted exception to policy was revoked in July 2025, which was unnecessary since she already had a female DEERS marker. But Navy/Marine Corps policy now tied uniform and grooming standards to biological sex. This was not a major problem as to the Marine Corps Combat Utility Uniform which is unisex and allowed LtCol Trainor to make a more androgynous presentation. But it was a serious problem as to the Service "B" and "C" Uniforms which are materially different for males and females. The Service "B" Uniform was generally required for Marines at the Pentagon on Fridays, and LtCol Trainor no longer had the male version of the Service "B" Uniform. This created friction and awkwardness for her colleagues. It was "yes sir" when she was in Utilities and "yes ma'am" when in Service "B" which simply attracted attention to her being transgender despite her efforts to blend in during this difficult time period. LtCol Trainor also no longer had the male version of the "C" Uniform – which was generally required at the Navy Yard, a duty station that was considered for her as an alternative to the Pentagon. This issue ultimately was alleviated somewhat when LtCol Trainor was transferred at her request to Marine Corps Base Quantico where the all-Marine environment was more welcoming and the Utility Uniform worn more frequently.

39. More fundamentally, LtCol Trainor now faced a sudden end to her Marine Corps career. The prior diagnosis of gender dysphoria made her ineligible to serve in the Marine Corps. While the ALNAV's and MARADMIN's stated that Marines could apply for an exception on a case-by-case basis, the Hegseth Policy showed that this exception was illusory. LtCol Trainor could have demonstrated 36 months of stability in her identified sex and a willingness to comply with the standards applicable to her identified sex. Indeed, her desire to remain in the Marine Corps was so intense that she actually considered getting clearance to resort to male uniform and grooming standards to reduce the friction that she faced. But LtCol Trainor could not comply with the Hegseth Policy requirement that she "has never attempted to transition" because she had, in fact, already transitioned.

40. Moreover, the confusing regulatory environment produced uncertainty. With more than 20 years of creditable Marine Corps service, LtCol Trainor was already eligible for regular retirement. Yet none of the directives explained how regular retirement figured into the calculus. In addition, a Marine above the rank of Captain with at least 20 years active duty can retire at the retirement pay of her current rank if she has at least three years' time in grade, i.e., she has been in that rank for at least three years. 10 U.S.C. § 1370(b)(1). LtCol Trainor's date of rank for Lieutenant Colonel is March 1, 2024, meaning she would have the necessary time in grade if she retired on or after March 1, 2027. Active duty through March 1, 2027 would have been entirely achievable had the federal government not decided to eliminate transgender persons from the Marine Corps. Not having the time in grade would mean retiring in the grade of Major, and would also permanently reduce her retired pay, which is computed on the average of the highest 36 months of basic pay to which she was entitled. 10 U.S.C. § 1407(c).

## V. <u>**The Decision to Retire**</u>

41. In the wake of the unfolding events, LtCol Trainor made it clear to her superiors as early as February 2025 that her intention was not to retire but to seek battalion command and promotion to Colonel and to remain in the Marine Corps for another 8-10 years. But obtaining clear information was difficult. Nonetheless, throughout this process, LtCol Trainor was specifically guided by the Manpower Military Policy Branch (MPO) of the Manpower Plans & Policy Division and the Separation and Retirement Section of Headquarters Marine Corps (MMSR-2). MPO is in charge of the transgender policy implementation; MMSR-2 is in charge of regular retirement requests. Both reside within Manpower and Reserve Affairs (M&RA).

42. LtCol Trainor put in a request to retire pursuant to the "voluntary" separation option described by the above ALNAV's and MARADMIN's. Originally submitted on June 1,2025, the request, as revised on June 17, 2025, sought a retirement date of March 1, 2026 pursuant to 10 U.S.C. § 1370(b)(1)(B) which authorizes a time in grade waiver if the retiring service member has at least two years' time in grade, thus allowing her to retire as a Lieutenant Colonel. In her application LtCol Trainor stated:

> While my decision to retire is knowingly made, it was not made freely; it is the direct and intended result of the EO 14183, SECDEF Memo "Prioritizing Military Excellence and Readiness," and ALNAV 038/25. No option exists allowing me to serve in the Marine Corps, which is what I desire to do. This forced retirement represents not only a loss to my career, but significant hardship to my family and irreparable harm to my professional reputation. I respectfully request to retire on 1 Mar 2026 to reach my 2 year TIG requirement in order to request a SecNav waiver for a 1 year waiver. This will allow me to retire at my current rank, the rank I achieved and intended to continue serving and leading Marines.

43. LtCol Trainor was directed to remove the above language and resubmit the request, which she did. However, on September 10, 2025, the request was returned without action by (MMSR-2. Instead, LtCol Trainor received direction by MPO and MMSR-2 to submit a regular retirement request independent of the process that emanated from the Hegseth Policy.

44. LtCol Trainor submitted her regular retirement request on September 16, 2025. That request relied for authority only upon the Marine Corps Separation and Retirement Manual, MCO 1900.16. LtCol Trainor sought a retirement date of March 1, 2027 which, if granted, would give her the necessary time in grade to retire as a Lieutenant Colonel. LtCol Trainor's regular retirement request was granted on October 16, 2025 with a retirement date of March 1, 2027. Without LtCol Trainor's involvement or request, the retirement date was further extended to June 1, 2027.

45. Throughout this process, both MPO and MMSR-2 had made it clear to LtCol Trainor that her regular retirement request was completely outside the process for implementing the Hegseth Policy. MMSR-2 gave very specific guidance to LtCol Trainor on how to prepare the package, including the exact language to use in requesting the time-in-grade waiver. MMSR-2 was very clear that by pursuing regular retirement, LtCol would not be placed in the "voluntary" lane dictated by the Hegseth Policy. MMSR-2 also told her that even if, for some reason, this turned into an involuntary separation, the worst that could happen would be a change in the retirement date, not a change in the retirement benefit, i.e., retirement as a Lieutenant Colonel. Moreover, MPO advised LtCol Trainor that her retirement would receive the re-enlistment and separator codes that go with regular retirement. In particular, the JDK separator code, which indicates separation for a "security reason," is reserved for involuntary separation and would not be used for a regular retirement.

46. While March 1, 2027 or beyond would give LtCol Trainor the retirement pay and benefits of a Lieutenant Colonel, it nonetheless rubbed salt in the wound, but for a different reason. Had the Hegseth Policy never issued, with three years' time in grade as of March 1, 2027, and given her demonstrated upward career trajectory, LtCol Trainor would have been eligible for

consideration by her first Colonel selection board. Eligibility is determined by date of rank and lineal standing. LtCol Trainor's date of rank is March 1, 2024, which places her below zone for the board convening in May 2027 and in zone for the board convening in May 2028. Under the approved June 1, 2027 retirement date she would have remained on active duty when the May 2027 board convened. The M&RA Action removes her from the competitive population before her first look. Nor would LtCol Trainor experience the next potential step in her career path – the chance to command a battalion, such as the 1st Law Enforcement Battalion at Camp Pendleton, California, where she had been both a platoon and company commander.

47. Although LtCol Trainor's regular retirement request had been approved independently from the process set up to separate transgender Marines, the regulatory environment remained uncertain. Therefore, through counsel, LtCol Trainor reserved her rights in this regard in a February 16, 2026 memorandum from her counsel to the Consolidated Disposition Authority – the Naval authority in charge of separating transgender Marines.

## VI. <u>The May 29, 2026 M&RA Action Accelerates LtCol Trainor's Retirement Date and Imposes Other Penalties</u>

48. On May 29, 2026, seven months after LtCol Trainor's retirement had been approved, a memorandum from the Deputy Commandant for M&RA turned everything upside down. ("M&RA Action"). Without any explanation or citing any facts in support, the M&RA Action accelerated the retirement date to November 1, 2026, decreed that LtCol Trainor receive a Re-enlistment Code (RE-Code) of 3G and further ordered that she be placed on administrative absence until retirement. This was a dramatically adverse turn of events for several reasons.

49. <u>First</u>, moving the retirement date to November 1, 2026 reduced LtCol Trainor's current time in grade to less than three years. This meant retirement in the grade of Major. It also permanently reduced her retired pay. Retired pay is computed on a base equal to the average of

the highest 36 months of basic pay to which the member was entitled. 10 U.S.C. § 1407(c). Because LtCol Trainor's date of rank is March 1, 2024, a November 1, 2026 retirement replaces four months of lieutenant colonel basic pay in that average with major basic pay, and deprives her of seven months of creditable service that would otherwise increase her multiplier.

50. Second, RE-Code 3G is defined by the Navy as a "condition (not a disability) interfering with service member's performance of duty." This is false. By the terms of LtCol Trainor's approved regular retirement, she was leaving the Marine Corps because she has more than 20 years' active service. The re-enlistment code for regular retirees is RE-2 ("[i]neligible for reenlistment. Recommended for reenlistment but ineligible because of status: Fleet Reservist Retired … Commissioned Officer." Presumably, the M&RA Action's use of RE-3G was because LtCol Trainor had a prior diagnosis of gender dysphoria. But the M&RA Action cited no evidence (and there is none) that her prior diagnosis of gender dysphoria interfered in the slightest with LtCol Trainor's performance of duties before or after transition. Had there been such impairment, she would have been referred to the Disability Evaluation System for a Medical Evaluation Board MEB) to determine whether she met retention standards. LtCol Trainor never had an MEB referral. The Disability Evaluation System determines whether a service member's physical or mental health condition renders them unfit for continued service. The MEB determines whether the member still meets retention standards and, if not, then a Physical Evaluation Board determines whether the member remains fit to perform their military duties. If not, then, depending on the degree of impairment, the member is medically separated or retired.

51. The RE-Code 3G was tantamount to a declaration that, because LtCol Trainor is transgender, she could not do her job in the Marine Corps, which also is false. Indeed, the approval of the retirement itself was a determination by the Secretary of the Navy that LtCol Trainor has

served satisfactorily. 10 U.S.C. § 1370(a)(1) & (2)(B). Moreover, RE-Codes can last forever. They are placed on the service member's DD-214 discharge form which a Veteran often must exhibit when applying for a job or seeking a license. Negative DD-214 information can be a lifetime stigma.

52. Third, since the approval of her retirement request, LtCol Trainor had been serving on active duty in Operations at Marine Corps Base Quantico in a fully deployable capacity. Now she was to go on administrative leave which made her non-deployable notwithstanding that she was fit and in compliance with all applicable Marine Corps standards. Although she was still paid, this in-limbo status deprived her of what she had devoted her life to: serving her country as a Marine.

53. The only authority that the M&RA Action specifically invoked was MARADMIN 189/26. But MARADMIN 189/26 was signed on April 23, 2026 more than six months ***after*** LtCol Trainor's retirement had been approved. Section 8.c of MARADMIN 189/26, "Marines Previously Approved for Retirement," stated that "Marines who are subsequently ***identified under this policy*** will transfer to the Fleet Marine Corps Reserve (FMCR) retirement list not later than six months from identification." (Emphasis added). MARADMIN 189/26, by its own terms, did not apply to LtCol Trainor. Moreover, had LtCol Trainor been "identified" pursuant to any of the methods described in MARADMIN 189/26, there would have been a medical records review by the Navy Bureau of Medicine and Surgery (BUMED) Deployability Action Cell. There is no evidence, and M&RA cited none, that such a review as to LtCol Trainor occurred after the issuance of MARADMIN 189/26. To the contrary, by April 23, 2026, LtCol Trainor's regular retirement was a closed matter. She had been approved for retirement on October 16, 2025, outside the process for separating transgender Marines, including MARADMIN 189/26 – all as directed by

MPO and MMSR-2. Indeed, the M&RA Action admitted as much when it stated that "[t]he Consolidated Disposition Authority will not issue a notification of separation due to your previously approved retirement request." CDA is the Naval authority in charge of separating transgender Marines.

54. LtCol Trainor was retiring because she had more than 20 years active duty in the Marine Corp, just like any other regular retirement for a Marine with that amount of service, and with the RE-Code that goes with regular retirement. M&RA's imposition of the RE-Code 3G on the basis of MARADMIN 189/26 without LtCol Trainor requesting it essentially converted a facially voluntarily retirement based on longevity into an involuntary separation under the Hegseth Policy. M&RA had no authority to take such action. Such authority resided exclusively with the Commander, Navy Installations Command who was designated as the CDA Consolidated Disposition Authority in charge of the separation of transgender Naval and Marine Corps personnel.

55. Under MARADMIN 189/26, officers who are involuntarily separated are entitled to a Board of Inquiry and notification of that right. LtCol Trainor has never received any such notification. The M&RA basically cherry-picked parts of MARADMIN 189/26 to impose obligations on LtCol Trainor that do not attach through regular retirement.

56. Moreover, while the M&RA Action did not expressly say it, the reference to MARADMIN 189/26 also implied that § 5.c.1 thereof would apply: "The Service will process officers for separation on the basis that their continued service is not consistent with the interests of national security, using the Military Personnel Security Program (JDK2) SPD code." An SPD (Separation Program Designator) Code states the reason for the separation from service, and it also goes on the DD-214. A regularly retired Marine officer receives the RDB1 separator code:

"sufficient service for retirement." Labeling LtCol Trainor with JDK2 would be another blow to her reputation. She had an active Top Secret/SCI security clearance for which there had never been any issues. To the contrary, her security clearance was subject to continuous monitoring, meaning that her records were checked on a continuous basis for any conduct inconsistent with holding a security clearance, and that process never yielded any negative information. Despite the spotless continuous monitoring, declaring LtCol Trainor a risk to national security would doom any chance for employment in a position requiring security or trust.

57. In letters (through counsel) to M&RA and to the Secretary of the Navy on June 5 and 26, 2026, respectively, LtCol Trainor requested that the M&RA Action be rescinded, the original June 1, 2027 retirement date be restored and the RE-Code 3G be eliminated She also requested, in the alternative, that her case be held in abeyance pending the outcome of the *Talbott* case since the preliminary injunction in that case had been affirmed by the D.C. Circuit as to active duty service members, and LtCol Trainor is a member of the proposed active duty class in *Talbott*. In the further alternative, she requested that, at a minimum, her retirement date be moved to no earlier than March 1, 2027 so that she could retire as a Lieutenant Colonel and that the RE-Code 3G be removed. LtCol Trainor received no response to either letter.

58. LtCol Trainor has suffered and, absent declaratory and injunctive relief from this Court, will continue to suffer irreparable harm as a result of the Hegseth Policy. As the D.C. Circuit ruled in Talbott, the unconstitutional denial of equal protection that the Hegseth Policy likely inflicts on active duty service members, standing alone, constitutes irreparable injury because "the 'loss of constitutional freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Talbott* 176 F.4th at 747 (citation omitted). LtCol Trainor is forced, on a daily basis, to endure the indignity of not being able to serve her county as a Marine

for reasons that have nothing to do with her ability or fitness. The Hegseth Policy likewise destroys any hope she had to be considered for a command or for promotion to Colonel.

59. The arbitrary and capricious manner in which the Hegseth Policy has been applied to LtCol Trainor in the M&RA Action will cause her to suffer irreparable harm absent declaratory and injunctive relief from this Court. Assigning LtCol Trainor RE-Code 3G signals that she has a condition that impaired her ability to perform her Marine Corps duties – which her Marine Corps performance record demonstrates is completely false. Similarly, applying the JDK2 separator code and branding LtCol Trainor a threat to national security also is false. These labels are particularly damning for a Marine whose primary MOS is Military Police Officer. Both stigmas also will likely interfere with future employment opportunities. Furthermore, as a result of the M&RA Action, LtCol Trainor will be known for the rest of her life as a retired Major when she earned the rank of Lieutenant Colonel – a gratuitous indignity that the government could have prevented but refused in its haste to accelerate her retirement.

60. LtCol Trainor has suffered and, absent declaratory and injunctive relief from this Court will continue to suffer, irreparable harm as a result of Defendants' denial of her right to due process prior to the deprivation of LtCol Trainor's liberty and property. LtCol Trainor has a protected property interest in her approved regular retirement, but the M&RA Action's degrading of that regular retirement occurred with no opportunity to be heard, and LtCol Trainor's subsequent request for reconsideration was never answered. LtCol Trainor's forced retirement, accompanied by defamatory and stigmatizing re-entry and separation codes invades her protected liberty interests without any meaningful opportunity to be heard.. LtCol Trainor's fitness to serve was never put before the Disability Evaluation System. The Board of Inquiry hearing for a Marine officer involuntarily separated is largely meaningless. The Board must limit is findings to whether

the Marine had a history, diagnosis or symptoms consistent with, gender dysphoria. The Board has no express authority to ascertain whether, despite such findings, the officer can perform to Marine Corps standards.

61. None of the foregoing injuries is redressable in an action for damages against the government. LtCol Trainor has no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I

### (Denial of Due Process Under the Fifth Amendment – Equal Protection )

62. Plaintiff incorporates and realleges herein all preceding paragraphs as if restated here in full.

63. The equal protection component of the Fifth Amendment prohibits the federal government from denying persons the equal protection of the law.

64. By coercing LtCol Trainor to prematurely terminate her Marine Corps career and by subjecting her to the other actions detailed above, Defendants have discriminated against LtCol Trainor on the basis of her sex and because she is a transgender female Marine without lawful justification.

65. Even if Defendants' actions truly were based on a medical condition – gender dysphoria – the differential treatment of LtCol Trainor described above had no rational basis and, instead, was motivated by an animus towards transgender people.

66. Through the actions described above, Defendants have violated LtCol Trainor's rights under the equal protection component of the Fifth Amendment.

## COUNT II

## (Denial of Procedural Due Process Under the Fifth Amendment)

67. Plaintiff incorporates and realleges herein all preceding paragraphs as if restated here in full.

68. The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving a person of liberty or property without procedural due process of law.

69. By degrading the terms of LtCol Trainor's retirement, Defendants have invaded a property interest of LtCol Trainor that is protected by the Fifth Amendment.

70. By forcing her to prematurely retire with defamatory and stigmatizing re-entry and separation codes permanently affixed to her separation documents, Defendants have invaded a liberty interest of LtCol Trainor that is protected by the Fifth Amendment.

71. LtCol Trainor had no meaningful opportunity to be heard regarding the actions set forth in the M&RA Action, either before or after the M&RA Action was issued.

72. Unlike the case with other medical or mental health conditions, LtCol Trainor was given no opportunity to show in a Disability Evaluation System proceeding that she is fit for Marine Corps service despite her history or prior diagnosis of gender dysphoria.

73. A Board of Inquiry is not a meaningful opportunity for LtCol Trainor to be heard because a Board of Inquiry's findings are strictly limited to whether a Marine had a history, prior diagnosis or experienced symptoms consistent with gender dysphoria without any express authority for the Board to decide whether that gender dysphoria renders a Marine officer unable to meet Marine Corps performance standards.

74. Through the actions described above, Defendants have denied LtCol Trainor the procedural due process that is guaranteed by the Fifth Amendment.

## COUNT III

**(Violation of the Administrative Procedure Act – Agency Action That is Arbitrary and Capricious, an Abuse of Discretion and/or Contrary to Law**

75. Plaintiff incorporates and realleges herein all preceding paragraphs as if restated here in full now.

76. A reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, and abuse of discretion or otherwise not in accordance with law.

77. The M&RA Action is arbitrary, capricious, an abuse of discretion and contrary to law for the reasons set forth herein, including that the actions in the M&RA Action were totally unexplained; the M&RA violated its own regulation by applying MARADMIN 189/26 to LtCol Trainor even though she is not subject to that directive by its own express terms, and the M&RA Action gave MARADMIN 189/26 impermissible retroactive effect.

78. The M&RA Action must be held unlawful under the APA and set aside.

## PRAYER FOR RELIEF

LtCol Trainor requests the following relief:

A. An order declaring that the Hegseth Policy and all of the Navy and Marine Corps directives derived from or based upon the Hegseth Policy, are unconstitutional and unenforceable as applied to Plaintiff;

B. An order preliminarily enjoining Defendants from taking any adverse action against Plaintiff based on the Hegseth Policy and all of the Navy and Marine Corps directives derived from or based upon the Hegseth Policy;

C. An order permanently enjoining Defendants from taking any adverse action against Plaintiff based on the Hegseth Policy and all of the Navy and Marine Corps directives derived from or based upon the Hegseth Policy;

D. An order declaring that the May 29, 2026 M&RA Action is arbitrary and capricious, an abuse of discretion and/or contrary to law and setting the May 29, 2026 M&RA Action aside;

E. An order preliminarily enjoining and/or staying, under 5 U.S.C. § 705, the May 29 M&RA Action pending the outcome of this litigation and reinstating Plaintiff's previously approved retirement, including the retirement date of June 1, 2027, retirement as a Lieutenant Colonel and application to Plaintiff of the reenlistment and separator codes applicable to regular retirement, prohibiting use of the RE-3G and JDK2 codes as to Plaintiff, and reinstating Plaintiff to full active duty status;

F. An order permanently enjoining the May 29, 2026 M&RA Action and permanently enjoining Defendants from taking any adverse action against Plaintiff based upon the May 29, 2026 M&RA Action;

G. An order preliminarily and permanently enjoining Defendants from requiring Plaintiff to comply with any uniform, grooming, physical fitness or other Marine Corps requirements and standards other than those that are applicable to female Marine Corps officers.

H. An order awarding Plaintiff her reasonable attorneys' fees and costs incurred in bringing this action; and

I. Such other relief as the Court deems just and proper.

Dated this 31st day of August, 2026.

Respectfully Submitted,

*/s/ John M. Simpson*

John M. Simpson (D.C. Bar No. 256412)
Duane Morris LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C. 20001-4795
Telephone: +1 202 776 7800
Fax: +1 202 776 7801
E-mail: jmsimpson@duanemorris.com

*Counsel for LtCol Avery A. Trainor*

**CERTIFICATE OF SERVICE**

I, John M. Simpson, hereby certify that on August 31, 2026, I caused a true and correct copy of the foregoing to be served on USADC.ServiceCivil@usdoj.gov and peter.pfaffenroth@usdoj.gov and through filing on the Court's Electronic Court Filing ("ECF") system.

*/s/ John. M. Simpson*
John M. Simpson